UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

SALVADOR SANCHEZ,

        Plaintiff,

v.                                                  Case No. 15-cv-935-pp

TODD OLIG, *et al.*,

        Defendants.

---

**DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 65), GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 70) AND DISMISSING CASE**

---

      The plaintiff, who is representing himself, filed this lawsuit under 42 U.S.C. §1983, alleging that the defendants violated his constitutional rights. The court allowed the plaintiff to proceed on two claims: first, that defendants Paul Ludvigson, Todd Olig and Jeremy Westra retaliated against him, violating the First Amendment; and second, that Olig used excessive force against him, violating the Eighth Amendment. Both the plaintiff and the defendants filed motions for summary judgment. The court grants the defendants' motion for summary judgment, denies the plaintiff's motion for summary judgment and dismisses the case.

## I. RELEVANT FACTS[1]

The plaintiff was housed at Waupun Correctional Institution (Waupun) at the time the incidents underlying this lawsuit occurred. Dkt. No. 67 at ¶2; Dkt. No. 72 at ¶1. Defendant Todd Olig worked there as a correctional officer, defendant Jeremy Westra worked as a Supervising Officer 2 (Captain), and defendant Paul Ludvigson worked as the corrections program supervisor in the Restrictive Housing Unit (RHU). Dkt. No. 72 at ¶¶2-4.

On June 9, 2015, Olig worked first shift on the B wing of the RHU, where the plaintiff was housed. Id. at ¶6. Olig passed out medication as part of his normal duties, a process referred to as "medication pass." Id. at ¶7. Officers control the medication for inmates on the A and B wings of the RHU. Id. at ¶8. Medical staff members place the medications on a cart for the correctional officer assigned to each wing to deliver to the inmates. Id. The morning medication pass begins at 6:00 a.m., starting with an announcement over the intercom. Id. at ¶ 9. In order to receive his medications, an inmate must be standing at his cell door with the light on, wearing a minimum of pants. Id. at ¶10. The "Segregation Unit Handbook," which is given to all inmates on entry to the RHU, outlines the medication pass process. Id. at ¶11. Inmates are expected to read the handbook and comply with the rules it outlines. Id.

---

[1] The court takes the relevant facts from the plaintiff's proposed findings of fact, dkt. No. 68, the plaintiff's declaration in support of his motion for summary judgment, dkt. no. 67, the defendants' proposed findings of fact, dkt. no. 72, and the plaintiff's response to the defendant's proposed findings of fact, dkt. no. 81.

2

According to Olig, the plaintiff was not at his door with the light on when Olig went past on the morning of June 9, 2015, so Olig continued without delivering medication to the plaintiff; he also did not deliver medication to other inmates on the B wing who were not, according to Olig, following RHU rules. Id. at ¶¶12-13. Olig alleges that the plaintiff began to complain loudly about being skipped for medication pass. Id. at ¶14. He says that he walked over to the plaintiff's cell and told him that he did not give the plaintiff his medication because the plaintiff didn't follow RHU rules, and that Olig would come back if he had time. Id. at ¶15. Olig indicates that he left the plaintiff's door, and denies that he ever intentionally kicked or hit the plaintiff's door. Id. at ¶16-17. Later, Olig alleges, he went back to all the cells of B wing inmates who were not at their door for the initial medication pass to give them their medicine. Id. at ¶18.

According to the plaintiff, jail staff did not give the inmates on the B wing proper notice that medication pass was going to begin, though he states that he did follow RHU procedure and was at his cell door. The plaintiff confirms that he began to complain loudly when Olig went past his cell without giving him his medication. Dkt. No. 68 at ¶4. The plaintiff alleges that Olig walked back over to his cell, ultimately kicking the plaintiff's cell door. Id. at ¶¶5-6; Dkt. No. 67 at ¶6. According to the plaintiff, his finger was pinched in the door, causing severe pain and bleeding behind the fingernail. Id. at ¶7.

Olig indicates that the plaintiff reported the pinched finger to Olig, who called the Health Services Unit (HSU) to let the nurse know. Dkt. No. 72 at ¶19.

3

Nurse DeYoung saw the plaintiff at his cell door at 8:50 a.m., and noted that he had a "1/2 by 1/4 [inch] abrasion split thickness over DIP (distal interphalangeal joint) of 4th finger and no active bleeding." Dkt. No. 72 at ¶20; see also Dkt. No. 68 at ¶9. Nurse DeYoung told the plaintiff that she would evaluate him in the HSU exam room as soon as possible. Dkt. No. 72 at ¶21.

Around 11:45 a.m., Olig escorted the plaintiff to the HSU examination room so that Nurse DeYoung could assess his injury. Id. at ¶22; Dkt. No. 68 at ¶9. The plaintiff says that, in Olig's presence, he told the nurse that Olig had kicked his door and caused the injury, and he says Olig did not deny it or write the plaintiff up for lying. Dkt. No. 68 at ¶10. Olig says he doesn't remember the plaintiff telling the nurse he had kicked Sanchez's door. Dkt. No. 72 at ¶23. The nurse's notes from her visit to the plaintiff's cell indicate that the plaintiff told her that his finger was pinched when Olig kicked his door. Dkt. No. 67-3 at 1-2. The nurse did not note or feel any signs of deformity "other than abrasion." Dkt. No. 72 at ¶24.

The next day, June 10, 2015, the plaintiff submitted an information request to the security office in which he alleged that Olig kicked his door during the 6:00 a.m. medication pass the previous day, causing injury to his right ring finger. Id. at ¶25; Dkt. No. 68 at ¶11. Defendant Paul Ludvigson states that he interviewed the plaintiff about the incident, dkt. no. 72 at ¶26; the plaintiff says that Ludvigson never interviewed him, dkt. no. 81 at ¶26.

Ludvigson then downloaded three video clips from the video recording system at Waupun. Dkt. No. 72 at ¶26. The first clip begins at 6:08:44 a.m.

4

and shows Olig walking back towards the plaintiff's cell from the opposite end of the hallway. Id. at ¶27; Dkt. No. 74-1. Olig then speaks to the plaintiff through the door, gesturing at the plaintiff, then walks back down the hall. Dkt. No. 74-1. The clip ends at 6:09:46. Id. The plaintiff alleges that the video "skips" at 6:09:05 for one to two seconds, and that it was during this time that Olig kicked the door. Dkt. No. 68 at ¶14.

The next clip begins at 6:28:30, and shows Olig delivering medications to the plaintiff. Dkt. No. 72 at ¶28; Dkt. No. 74-1. The final clip, which picks up where the second one left off and begins at 6:29:47, begins with three to four seconds of a "frozen" image, then shows Olig closing the trap on the plaintiff's cell door and walking away, pushing the cart. Dkt. No. 72 at ¶29; Dkt. No. 74-1.

Having reviewed the clips, Ludvigson found no evidence that Olig had kicked the plaintiff's cell door. Dkt. No. 72 at ¶30. On June 23, 2015, Ludvigson issued Conduct Report No. 2639723 to the plaintiff for lying about an employee, violating Wis. Admin. Code. §DOC 303.32. Id. at ¶¶31, 33. Olig had no part in writing that particular conduct report. Id. at ¶32; Dkt. No. 68 at ¶12. On June 24, 2015, the Security Director's designee approved the report to proceed as a major offense, noting that the plaintiff recently had "been warned about the same or similar conduct and … created a risk of serious disruption at the facility or in the community." Dkt. No. 72 at ¶36. Staff provided the plaintiff with a copy of the conduct report and a Notice of Major Disciplinary Hearing Rights, and assigned him a staff representative. Id. at ¶¶37. The

5

plaintiff says that the only contact he had with a representative was a substitute he met with the night before the hearing. Dkt. No. 68 at ¶13.

Defendant Jeremy Westra was assigned as the hearing officer for the disciplinary hearing on Conduct Report No. 2639723. Dkt. No. 72 at ¶38. Westra had no prior knowledge of or involvement in the incidents at issue in the Conduct Report. Id. at ¶39. On June 24, 2015, Westra received an "Inmate's Request for Attendance of Witness/Evidence" form from the plaintiff. Id. at ¶40; see also Dkt. No. 68 at ¶13. The plaintiff asked that Olig, Ludvigson and a nurse appear as witnesses at the disciplinary hearing; he also asked for his medical records from June 9, 2015 and the video evidence from Olig's 6:00 a.m. medicine pass. Dkt. No. 72 at ¶40. Westra approved the video evidence and all the witnesses except the nurse (because the plaintiff did not specify a name). Id. at ¶41. The plaintiff says that he also asked for the RHU movement log, but that he did not receive that log or his medical records. Dkt. No. 81 at ¶41.

The hearing took place on July 9, 2015. Dkt. No. 72 at ¶43; Dkt. No. 68 at ¶14. The plaintiff gave a verbal statement that Olig kicked his cell door during the medication pass, "pinching his hand in the door." Dkt. No. 72 at ¶43. Ludvigson testified that when he watched the video, he did not see Olig hit or kick the plaintiff's door. Id. at ¶44. Olig testified that he didn't hit or kick the plaintiff's door. Id. at ¶45. Westra reviewed the video evidence. Id. at ¶47. The plaintiff claims that he told Westra that the video was missing footage, dkt. no. 81 at ¶51; Westra said he had no reason to believe that any footage was

6

missing, and that he "assumed" that he'd been given the video evidence the plaintiff had requested, dkt. no. 72 at ¶51. The defendants assert that the video was not the "sole deciding factor" in Westra's decision to find the plaintiff guilty of the violation. Dkt. No. 72 at ¶52. Westra asserts that, after learning of the plaintiff's claim that footage was missing, he went back and reviewed the clips at Dkt. No. 74-1, and that his review did not "reveal any information that would have changed his finding at the disciplinary hearing." Id. at ¶53.

Westra ordered the plaintiff to serve ninety days in disciplinary separation. Id. at ¶58.

## II. DISCUSSION

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material" facts are those "that might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed, or is genuinely disputed, must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations

(including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B. The Court's Analysis

The court allowed the plaintiff to proceed on four claims: (1) a retaliation claim against Ludvigson, who issued the conduct report claiming that the plaintiff lied about staff; (2) a retaliation claim against Olig, who testified at the disciplinary hearing that he did not kick the plaintiff's door; (3) a retaliation claim against Westra, who conducted the disciplinary hearing and issued the sanction of additional segregation; and (4) an excessive force claim against Olig, who the plaintiff claims kicked his cell door, resulting in the plaintiff's finger being pinched between the door and the door jam. Dkt. No. 17 at 10-11.

   1. *Retaliation Claims*

At the summary judgment stage, the plaintiff has the initial burden to make out a *prima facie*[2] case of retaliation by showing that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely

---

[2] A *prima facie* case is a case in which there is enough evidence to show that the plaintiff could prove his claim, unless the defendants present substantial contradicting proof.

to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." Hawkins v. Mitchell, 756 F.3d 983, 996 (7th Cir. 2014). If the plaintiff makes this *prima facie* showing, the defendants then must show that they would have taken the adverse action even if the plaintiff had not exercised his First Amendment right. Mays v. Springborn, 719 F.3d 631, 634 (7th Cir. 2013); see also, Greene v. Doruff, 660 F.3d 975, 979 (7th Cir. 2011) (if inmate meets all three elements, burden shifts to show that officers would have taken the same actions "even in the absence of protected conduct"). If the defendants meet this burden, the burden shifts back to the plaintiff to show that the non-retaliatory reason the defendants gave for taking the action was a "pretext"—made up to cover up the real reason, which was the intent to retaliate. Thayer v. Chiczewski, 705 F.3d 237, 252 (7th Cir. 2012).

    a. Ludvigson

It is undisputed that on June 10, the plaintiff submitted an information request, alleging that Olig kicked his door and injured his finger. It is undisputed that because the plaintiff made that information request, Ludvigson issued the conduct report against him. While the parties don't directly address it, the court assumes for the purposes of summary judgment that getting a conduct report is the kind of action that could chill an inmate from exercising his First Amendment rights in the future.

Outside the prison setting, this would look like a *prima facie* case of retaliation in violation of the First Amendment. But when a court considers a

9

prisoner's allegation that his constitutional rights were violated, the analysis changes. This is because of the unique challenges posed by a prison setting. Prisoners, like anyone else, have constitutional rights that federal courts must recognize. See Turner v. Safley, 482 U.S. 78, 84 (1987) (citing Procunier v. Martinez, 416 U.S. 396, 405 (1974)). At the same time, "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." Id. at 84-85. When a court analyzes a prisoner's claim that a member of the prison staff may have violated his constitutional rights, that court must consider both "the policy of judicial restraint regarding prisoner complaints and . . . the need to protect constitutional rights." Id. at 85 (quoting Procunier, 416 U.S. at 406). In striking this balance, the Supreme Court has held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Id. at 89.

In deciding whether a prison regulation is reasonably related to legitimate penological interests, a lower court must determine whether there is a "valid, rational connection" between the regulation and the government's interest; whether there are alternative means of exercising their rights open to inmates; the impact accommodating the prisoner's right will have on guards and other inmates; and whether there are any "ready alternatives" to the action that deprived the prisoner of his rights. Id. at 89-90.

Here, the government action that the plaintiff challenges is Ludvigson's

10

issuance of the conduct report against him for lying. There is a regulation—Wis. Admin. Code. §DOC 303.32—that prohibits an inmate from lying about a prison employee. There is a connection between prohibiting an inmate from lying about prison employees and a legitimate penological interest. That interest is prison order and security. The Supreme Court has held that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." Bell v. Wolfish, 441 U.S. 520, 546 (1979). On this basis, the plaintiff cannot prove a retaliation claim against Ludvigson.

Even if the law did not allow some impingement on a prisoner's constitutional rights if that impingement has a reasonable connection to a legitimate penological interest, the plaintiff still could not prove a retaliation claim against Ludvigson. If the court assumes that the plaintiff was engaging in speech protected by the First Amendment when he said in the information request that Olig kicked his door and injured his finger, then arguably the plaintiff presented a *prima facie* case for First Amendment retaliation. But the analysis does not end there. The burden then shifts to the defendant—in this case, Ludvigson—to show that he did not issue the conduct report as retaliation, but for some legitimate reason. Ludvigson has presented that evidence.

The evidence shows that Ludvigson reviewed the plaintiff's grievance, watched the video footage, then issued the conduct report. The video clips—

which are part of the court record—do not show Olig kicking the door. There is no evidence that Ludvigson had reason to doubt the video. The evidence shows that Ludvigson had reason to believe that the plaintiff lied about Olig kicking the door. Ludvigson argues—and the evidence supports this argument—that he issued the conduct report because he had reason to believe that the plaintiff lied about a prison employee. As the court noted, there is a regulation that prohibits inmates from lying about prison employees. Ludvigson has given the court a non-retaliatory reason for issuing the conduct report.

Given that, the burden shifts back to the plaintiff to show that Ludvigson's explanation is a pretext. The plaintiff has presented no evidence that Ludvigson's reason was pretextual. In fact, the evidence supports Ludvigson's belief that there was no evidence to show that Olig purposefully kicked the plaintiff's door, or purposefully injured him. Ludvigson issued the conduct report because he believed that the plaintiff had lied about Olig, and lying about a prison employee is prohibited conduct.

The Seventh Circuit Court of Appeals confronted just this situation in Hasan v. U.S. Dept. of Labor, 400 F.3d 1001 (7th Cir. 2005). In Hasan, the inmate plaintiff alleged that the defendants issued a conduct report against him in retaliation for his filing a grievance. Id. at 2005. The court rejected that claim, because "the defendants presented uncontradicted evidence that they punished [the plaintiff] not because he tried to exercise free speech but because his accusation was a lie; and if as we must assume this was their true motive, there was no retaliation." Id. See also, McClain v. Leisure, 192 Fed. Appx. 544,

550 (7th Cir. 2006) (rejecting the plaintiff's retaliation claim "because the prisoner was punished for making false accusations, not for his exercise of a First Amendment right" (citing Hasan, 400 F.3d at 1005)); Watkins v. Kasper, 599 F.3d 791, 799 (7th Cir. 2010) (citing Smith v. Mosley, 532 F.3d 1270, 1277 (11th Cir. 2008) (concluding that speech found to be false and insubordinate under a valid prison regulation was unprotected).

In sum, Ludvigson has presented uncontradicted evidence showing that he issued the conduct report because he believed the plaintiff lied about Olig. He has shown that he had a non-retaliatory motive for issuing the conduct report. And even if the issuance of that conduct report might have chilled the plaintiff's exercise of his First Amendment rights, Ludvigson's action, and the regulation he cited, had a reasonable connection to a legitimate penological interest. The court will grant summary judgment in favor of Ludvigson.

b. Westra

The evidence shows that Westra had nothing to do with the decision to file the conduct report; he presided over the disciplinary hearing, and found the plaintiff guilty of lying about Olig. The plaintiff has not presented any evidence that Westra's decision finding the plaintiff guilty of lying was motivated by a desire to retaliate against the plaintiff. Westra states that he heard testimony, watched the video evidence, and determined from that evidence that the plaintiff lied about Olig kicking the cell door. The plaintiff has not presented any evidence to rebut this proof of a non-retaliatory motive. The court will grant summary judgment in favor of Westra.

    c. Olig

As the court discussed above, one of the things the plaintiff must show to prove a *prima facie* case of retaliation is that the defendant deprived him of something in retaliation for the exercise of the plaintiff's First Amendment rights. The plaintiff has not alleged that Olig deprived him of anything as a result of the plaintiff telling other prison staff that Olig had kicked his door. He has not presented proof that Olig was involved in writing the conduct report or in reaching a decision on the conduct report and deciding the appropriate punishment. Liability under §1983 requires personal involvement, <u>Vance v. Peters</u>, 97 F.3d 987, 991 (7th Cir. 1996), and there is no evidence Olig was personally involved with depriving the plaintiff of anything as a result of the plaintiff's allegations. Because the plaintiff has not shown that Olig deprived him of anything, or that Olig was personally involved in issuing or ruling on the conduct report, the court will grant summary judgment in favor of Olig on the plaintiff's retaliation claim.

  *2. Excessive Force Claim*

The Eighth Amendment to the Constitution protects citizens from cruel and unusual punishment. Where prison officials are accused of using excessive physical force in violation of the Eighth Amendment, the "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 37 (2010) (quoting <u>Hudson v. McMillian</u>, 503 U.S. 1, 7 (1992)). Courts look at several factors, including the need for the application of the

force, the amount of force applied, the threat an officer reasonably perceived, the effort made to temper the severity of the force used, and the extent of the injury that force caused to an inmate. Fillmore v. Page, 358 F.3d 496, 504 (7th Cir. 2004) (citing DeWalt v. Carter, 224 F.3d 607, 619 (7th Cir. 2000)).

"When prison officials maliciously and sadistically use force to cause harm, … contemporary standards of decency always are violated" and this is true "whether or not significant injury is evident." Wilkins, 559 U.S. at 37 (quoting Hudson, 503 U.S. at 9). However, not "every malevolent touch by a prison guard gives rise to a federal cause of action." Id. (quoting Hudson, 503 U.S. at 9). A plaintiff cannot support an excessive force claim when the defendant used *de minimis*—a minor or insignificant amount of—force. Fillmore, 358 F.3d at 504. "Thus, not every push or shove by a prison guard violates a prisoner's constitutional rights." DeWalt, 224 F.3d at 620 (citing Hudson, 503 U.S. at 9). "Even if an officer's use of force serves no good-faith disciplinary purpose, the force may be so '*de minimus*' that it does not violate the Eighth Amendment." Hendrickson v. Cooper, 589 F.3d 887, 890 (7th Cir. 2009) (citations omitted).

Olig denies that he kicked the plaintiff's cell door on the day in question. Ludvigson and Westra viewed the video, and it did not show Olig kicking the plaintiff's door. For purposes of summary judgment, however, Olig argues that even viewing the plaintiff's claim in the light most favorable to the plaintiff, the plaintiff's claim that Olig kicked the door during a one- to two-second "skip" in the video indicates only *de minimus* use of force.

15

Olig returned to Sanchez's cell door early on in his medication pass. The video footage shows Olig standing close to the window in the cell door, pointing into the cell and speaking to Sanchez. His posture and movements suggest he was frustrated, at the least. It is not entirely clear, but the court reads the plaintiff's briefs, declarations, and other filings to allege that it was during this first encounter that Olig kicked the door. The plaintiff accurately notes that there are a couple of moments in this video clip where the video "freezes." The third and final clip, when Olig was again standing in front of the plaintiff's door, begins with four to five seconds of "frozen" footage. So—there is a factual dispute over whether, during the "frozen" moments of video, Olig kicked the plaintiff's cell door.

The question on summary judgment is whether that factual dispute is "material." The court finds that it is not. In order for an officer's use of force to be excessive, the quantum of force he uses must be "repugnant to the conscience of mankind." Hudson, 503 at 10 (internal quotation and citation omitted). To survive a motion for summary judgment, the plaintiff must offer evidence that would allow a jury to infer that the defendant wantonly inflicted pain on the plaintiff. Whitley v. Albers, 475 U.S. 312, 319 (1986). The plaintiff cannot meet that burden. Even taking the plaintiff's version of events as true, Olig kicked the plaintiff's *door*; he did not kick, or hit, or exert force against the plaintiff himself. The plaintiff has presented no evidence that Olig knew the plaintiff's finger was between the door and the door jam. The plaintiff has presented no evidence that Olig kicked the door knowing the plaintiff's finger

16

would get pinched or injured in some way. While it may have been inadvisable for Olig to kick the door (if he did), and unnecessary, it only would constitute excessive force if Olig did it for the purpose of maliciously causing harm to the plaintiff.

At best, the plaintiff has alleged that Olig kicked his door in frustration, and in the process, caused the plaintiff injury. Even viewed in the light most favorable to the plaintiff, that is an allegation of negligence, not intentional use of force to harm the plaintiff. Negligence (even gross negligence) does not constitute a constitutional violation. Rosario v. Brawn, 670 F.3d 816, 821 (7th Cir. 2012).

Because the plaintiff's allegations, even if true, do not support his claim that Olig used excessive force against him, the court will grant summary judgment in favor of Olig on the excessive force claim.

### III. CONCLUSION

The court **DENIES** the plaintiff's motion for summary judgment. Dkt. No. 65.

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 70.

The court **ORDERS** that the case is **DISMISSED**, and will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment.

*See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 21st day of March, 2018.

**BY THE COURT:**

_____

**HON. PAMELA PEPPER**
**United States District Judge**